DECISION
 IN MANDAMUS {¶ 1} Relator, Timothy J. Fugate, has filed an original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order finding relator had been overpaid temporary total disability compensation from the period of September 2, 2002 to June 16, 2006, on the basis that relator had worked during that time. Relator also requests that this court vacate the commission's additional finding that relator committed civil fraud by concealing *Page 2 
from physicians, as well as the Ohio Bureau of Workers' Compensation, the fact that he was working during the relevant time period.
 {¶ 2} This matter was referred to a magistrate of this court, pursuant to Civ. R. 53(C) and Loc. R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) No objections have been filed to that decision.
 {¶ 3} Finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's recommendation, relator's requested writ of mandamus is denied.
Writ of mandamus denied.
 BRYANT and SADLER, JJ., concur. *Page 3 
 APPENDIX A MAGISTRATE'S DECISION IN MANDAMUS {¶ 4} Relator, Timothy J. Fugate, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order finding that relator had been overpaid temporary total disability ("TTD") compensation for the period September 2, 2002 to June 16, 2006 on the *Page 4 
basis that relator had worked during that time period. The commission also made a finding of civil fraud on the basis that relator had concealed the fact that he was working from his doctor and other doctors who examined him as well as from the Ohio Bureau of Workers' Compensation ("BWC"). Relator requests that this court also vacate the commission's finding of fraud.
Findings of Fact: {¶ 5} 1. Claimant sustained a work-related injury on March 10, 2000, and his claim was originally allowed for "lumbosacral sprain." Between 2002 and 2005, relator's claim was additionally allowed for the following conditions: "major depressive disorder; pain disorder; aggravation of pre-existing arthritis of the lumbar spine; lumbosacral spondylosis, degenerative disc disease L4-5 and L5-S1."
 {¶ 6} 2. From the date of injury through 2005, relator was paid TTD compensation and/or living maintenance payments for different time periods. At times, those payments were terminated when relator's currently allowed conditions reached maximum medical improvement; however, as new conditions were allowed, TTD compensation was reinstated.
 {¶ 7} 3. Relator did not return to employment at the job he had on the date he was injured.
 {¶ 8} 4. In March 2007, the BWC's Special Investigations Unit ("SIU") filed a motion requesting that there be a finding of civil fraud and that an overpayment of TTD compensation be declared for the period June 8 through October 20, 2002, and from October 25, 2002 through June 16, 2006. The basis for the request was the allegation *Page 5 
that relator had been working while receiving TTD compensation during the periods at issue.
 {¶ 9} 5. The SIU submitted the following evidence in support of the allegation that relator had been working: (a) the SIU presented copies of checks made payable to claimant's wife Candy, including four checks from Alternative Heating and Cooling ("Alternative HC"). Check number 1117 in the amount of $300 was issued to Candy Fugate on July 3, 2003; check number 1119 in the amount of $400 was issued to Candy Fugate on July 4, 2003 and the memorandum line indicated the check was for accounting work; check number 1127 in the amount of $280 was issued to Candy Fugate on July 12, 2003 and the memorandum line indicated the payment was for bookwork; and check number 1129 in the amount of $680 was issued to Candy Fugate on July 17, 2003 and the memorandum line indicated that the payment was for bookkeeping. (b) Agents from the SIU interviewed Mark Gagnon, the owner of Alternative HC in November 2004. At first, Gagnon indicated that relator had not performed any work for him, but that his wife, Candy, had performed some work for him during the summer. (c) However, Gagnon later recanted and indicated the following: he approached relator during the summer 2003 to subcontract jobs for Alternative HC; he did not know that relator had a claim with the BWC; he paid relator $20 per hour for each job he worked; relator asked Gagnon to make the checks out to his wife so that his disability payments would not be affected; relator worked approximately two-to-three months in the spring/summer 2003 for a total of 140 hours and was paid approximately $2,800; relator installed duct-work, small hanging pipes, and did some brazing on copper pipes; and relator did not perform any heavy jobs because Gagnon knew relator had a bad back. Gagnon further stated that relator's wife, *Page 6 
Candy, had never worked for his company in any capacity. (d) The SIU also presented checks made out to relator's wife Candy, from various individuals. William Estep paid relator $51.64 and $90 for furnace and plumbing work. Estep recommended relator to Rosiland Morris to do some furnace repair work. Morris paid relator $100. John Ritter paid relator $130 to fix the brakes on his car (this included $120 to cover the cost of the parts). (e) The SIU also presented four checks payable to relator's wife Candy, from Smith Heating and Cooling ("Smith HC"). Those checks were in the amounts of $135 (June 8, 2002), $800 (September 2, 2002), $130.09 (September 13, 2002), and $250 (February 2, 2004). (f) Agents from the SIU interviewed relator in June 2005. According to the SIU report, relator admitted he did some work for which he received payment during the period in which he was receiving TTD compensation. Specifically, relator admitted he had been employed by both Alternative HC and Smith HC, that he completed work for Estep, Morris and Ritter, and that he had been employed by Burns Security while attending rehabilitation. Concerning his work for Smith HC, relator indicated that he worked there for approximately one month as a foreman supervising three employees. Relator indicated he oversaw the installation of residential heating and cooling units and admitted that the owner, Ron Darrin, gave him two checks in the amount of $500 and $800, which he cashed in Tennessee during a trip for a funeral.
 {¶ 10} 6. Relator submitted the affidavit of Ron Darrin, the owner of Smith HC. Darrin explained that check number 2390, dated June 8, 2002 and written to relator's wife, was to reimburse her for food purchased for a company picnic. Darrin further indicated that check number 2538, dated September 2, 2002 and written to relator's wife in the amount of $800, was a loan to enable relator to attend a funeral in Tennessee. *Page 7 
Darrin further indicated that check number 2573, dated September 13, 2002, in the amount of $130.09 and payable to relator's wife, was to reimburse her for parts she picked up for Darrin at AutoZone. Darrin also indicated that check number 3352, dated February 2, 2004, in the amount of $250 and made out to relator's wife, was to compensate relator for the time relator spent accompanying Darrin to Athens, Ohio, where Darrin was going to perform some work for Domino's Pizza. Darrin also addressed the supervisory work relator performed for him. Darrin indicated that he requested that relator oversee some renovation work at a sports bar/restaurant Darrin owned in Kettering, Ohio. Darrin indicated that relator was not to be paid; however, he was to receive a percent interest in Smith HC. Lastly, Darrin identified an invoice dated October 11, 2005, for work performed at Daymont Insurance in Dayton, Ohio. Darrin indicated that the employees of Daymont Insurance who indicated that relator had performed furnace work were mistaken. Darrin opined that those women mistakenly identified relator as performing the work.
 {¶ 11} 7. The BWC's motion was heard before a district hearing officer ("DHO") on April 18, 2007. The DHO determined that the BWC sustained its burden of proving by a preponderance of the evidence that relator knowingly used deception to obtain TTD compensation. Specifically, the DHO's order provides:
 * * * [T]he injured worker's counsel conceded that the injured worker had worked and received Temporary Total Disability Compensation for the time period of 03/31/2003 to 11/26/2003. During that time period the injured worker was employed with Alternative Heating and Cooling. The injured worker was paid by check. However, those checks were made out to his wife, Candy. In addition the 1099 issued for 2003 was also made out to the injured worker's wife, Candy. *Page 8 
 The injured worker had also received money from Ron Darrin, owner of Smith's Heating and Cooling. Mr. Darrin gave the injured worker two checks; one for $500 and one for $800. During an interview the injured worker stated that he quit working for Smith's Heating and Cooling because it simply did not work out. The first check from Smith's Heating and Cooling dates back to 09/02/2002.
 The Hearing Officer finds that the injured worker was employed in the same occupation he was at the time of the injury from 09/02/2002 through 11/26/2003 and then worked again on 10/11/2005 for Smith's Heating and Cooling while simultaneously receiving Temporary Total Disability Compensation. During this time period the injured worker had continuously informed his physicians, Dr. Donnini, Dr. Bromby, Dr. Cunningham and Dr. Farrell, that he was not working. The injured worker's physician of record did not have the knowledge that the injured worker had been working and in the same position he was in when he was injured. The Hearing Officer finds that the injured worker's employment in the heating and cooling industry serves as a representation of a falsehood that the injured worker was claiming to be unable to work over the same period of time in which he was apparently able to work. The Hearing Officer finds that the injured worker's ability to perform employment activities is a material fact in the Workers' Compensation disability certification process. The Hearing Officer finds that the injured worker knowingly signed at least five C-84 motions requesting Temporary Total Disability Compensation with the intent of misleading those examining it to believe and rely upon the misrepresentation that he was unable to work and the facts contained in said motions were correct and valid. The District Hearing Officer finds that the Bureau of Workers' Compensation justifiably relied upon the injured worker's representation of his inability to work as there was no evidence before it to the contrary. Finally, the District Hearing Officer finds that the Bureau of Workers' Compensation suffered an injury in the form of economic loss for compensation paid in the claim, proximately caused by the reliance on the injured worker's assertion that he was unable to work during a period of time in which it was later discovered he was employed with Alternative Heating and Cooling and Smith's Heating and Cooling. *Page 9 
 The Hearing Officer finds that the injured worker's argument that he had not worked after 11/26/2003 and therefore should be entitled to Temporary Total Disability Compensation after that date to be unpersuasive. The Hearing Officer finds that the injured worker did not inform his treating physicians that he had been working and had been working at the same job that he had prior to his injury. The injured worker told all of his treating physicians as well as independent medical examiners that he was unable to work.
 * * *
 This order is based on the C-84s submitted and signed by the injured worker, the injured worker's statements regarding his employment with Alternative Heating and Cooling and Smith's Heating and Cooling, copies of the cancelled checks from Smith's Heating and Cooling and the reports of Dr. Donnini dated 09/22/2003, Dr. Bromby dated 06/03/2003, Dr. Cunningham dated 08/25/2004, Dr. Farrell dated 08/30/2004, all stating the injured worker had informed them that he was not working and not capable of work.
 {¶ 12} 8. Relator appealed the DHO's order and the matter was heard before a staff hearing officer ("SHO") on May 29, 2007. The SHO affirmed the prior DHO's order and granted the BWC's motion. The SHO's order is essentially identical to the DHO's order with one exception — near the end of the SHO's order, the SHO addressed the arguments relator made in support of his appeal. In that regard, the SHO stated:
 The Staff Hearing Officer does not find persuasive the inconsistent statements made by Ron Darrin that the injured worker was not in fact employed by him. Further, the Staff Hearing Officer does not find persuasive the injured worker's submission of evidence showing that certain checks were in fact cashed after the district hearing. The Hearing Officer does not find persuasive the injured worker's submission of receipts that were also created after the last hearing. The Staff Hearing Officer finds this evidence to be nothing more than a subterfuge designed to avoid liability in this claim. The Hearing Officer does not find them to be persuasive evidence that fraud was not committed by the injured worker. *Page 10 
 {¶ 13} 9. Relator's subsequent appeal was denied by order of the commission mailed June 28, 2007.
 {¶ 14} 10. Relator's request for reconsideration was denied by order of the commission mailed August 23, 2007.
 {¶ 15} 11. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law: {¶ 16} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986),26 Ohio St.3d 7.